UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KRISTOPHER M. LEVITZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:20-cv-00407-SLC |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Kilolo Kijakazi,* | ) |
| *Acting Commissioner of Social Security*,[1] | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Kristopher M. Levitz appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF 1). For the following reasons, each of Levitz's arguments are unpersuasive, and thus, the Commissioner's decision will be AFFIRMED.

### I. FACTUAL AND PROCEDURAL HISTORY

Levitz applied for DIB and SSI on July 17, 2018, alleging disability as of June 1, 2018. (ECF 16 Administrative Record ("AR") 15, 214-20, 232-43). His claim was denied initially and upon reconsideration. (AR 74-95, 98-119). After a timely request (AR 159-60), a hearing was held on February 28, 2020, before administrative law judge ("ALJ") Genevieve Adamo, at which Levitz, who was represented by counsel, and a vocational expert ("VE") testified. (AR 35-73). On March 31, 2020, the ALJ rendered an unfavorable decision to Levitz, concluding that he was

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, *see, e.g.*, *Butler v. Kijakazi*, 4 F.4th 498 (7th Cir. 2021), and thus, she is automatically substituted for Andrew Saul in this case, *see* Fed. R. Civ. P. 25(d).

not disabled because he could perform a significant number of jobs in the economy despite the limitations caused by his impairments. (AR 15-28). Levitz's request for review was denied by the Appeals Council (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.981, 416.1481.

Levitz filed a complaint with this Court on November 12, 2020, seeking relief from the Commissioner's decision. (ECF 1). In his appeal, Levitz alleges that: (1) that the ALJ's step-five finding is not supported by substantial evidence because she failed to identify a significant number of jobs that Levitz could perform despite his impairments, (2) the VE failed to adequately explain the methodology used in arriving at the number of jobs, and (3)the ALJ failed to consider Levitz's alleged impairments in combination when assigning a residual functional capacity ("RFC"). (ECF 20 at 5).

At the time of the ALJ's decision, Levitz was forty-seven years old (AR 214), had a ninth or tenth grade education (AR 20, 41, 257), and had relevant work experience as an electrician helper, cook, recreational vehicle and trailer assembler, recreational vehicle roofer, and machine operator. (AR 26; *see also* AR 257). In his applications, Levitz alleged disability due to "right shoulder, back-2 crushed discs, 2 heart attacks" and "bad knees." (AR 256).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citations omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869 (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking DIB or SSI must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether he has a severe impairment, (3) whether his impairment is one that the Commissioner considers conclusively disabling, (4) whether he is incapable of performing his past relevant work; and (5) whether he is incapable of performing any work in the national economy.[2] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); *see also* 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The Commissioner's Final Decision

On March 31, 2020, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 15-28). At step one, the ALJ concluded that Levitz had not engaged in substantial gainful activity since June 1, 2018, his alleged onset date. (AR 17). At step two, the ALJ found that Levitz had the following severe impairments: bilateral knee osteoarthritis, diabetes mellitus, chronic obstructive pulmonary disease, hypertension, cardiomyopathy, congestive heart failure, obesity, and lumbar spondylolysis. (*Id.*).

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step three, the ALJ concluded that Levitz did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 18). The ALJ then assigned Levitz the following RFC:

> [T]he claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except as reduced by the following. Additional limitations include never climbing ladders, ropes, or scaffolds, and only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling. The claimant also needs to avoid concentrated exposure to extreme heat and cold, fumes, dust, gases, and poor ventilation, and needs to avoid unprotected heights.

(AR 19).

The ALJ found at step four that Levitz was unable to perform any of his past relevant work. (AR 26). At step five, the ALJ found that given his age, education, work experience, and RFC, Levitz could perform jobs that exist in substantial numbers in the national economy including call out operator, charge account clerk, and information clerk. (AR 27-28). As such, Levitz's applications for DIB and SSI were denied. (AR 28).

## C. Number of Jobs in the National Economy

Levitz first attacks the ALJ's step-five analysis—contending that the VE was unable to identify a significant number of jobs which Levitz could perform in the national economy. (ECF 20 at 18); *see Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009) ("[Step 5] requires the ALJ to determine the claimant's [RFC] and to ascertain whether there are a significant number of jobs that the claimant could perform . . . ."). As mentioned, the ALJ—relying on the VE's testimony—found that Levitz could work as a call out operator (8,000 jobs), charge account clerk (14,700 jobs); and information clerk (15,000 jobs), totaling 37,700 jobs in the national economy. (AR 27). Levitz argues that 37,700 jobs does not constitute a "significant" number of jobs in the national economy. (ECF 20 at 18-19 (citing *Sally S. v. Berryhill*, No. 2:18cv460,

5

2019 WL 3335033, at *11 (N.D. Ind. July 23, 2019) (finding that 120,350 jobs, or 0.080% of job existing in the national economy, did not constitute a significant number of jobs)). Levitz's argument, however, is unpersuasive.

"The Seventh Circuit [Court of Appeals] has not affirmatively established the threshold for the number of jobs in the national economy that qualifies as significant." *John C. v. Saul*, No. 4:19-cv-04111-SLD-JEH, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021). In *Weatherbee v. Astrue*, the Seventh Circuit found that 140,000 representative jobs in the national economy was "well above the threshold for significance," yet did not definitively identify an actual threshold. 649 F.3d 565, 572 (7th Cir. 2011); *see also Angela L. v. Saul*, No. 1:20-cv-00481-SEB-DML, 2021 WL 2843207, at *5 (S.D. Ind. July 7, 2021); *John C.*, 2021 WL 794780, at *5. In *Primm v. Saul*, the Seventh Circuit found that 110,000 jobs in the national economy was a significant number. 789 F. App'x 539, 546 (7th Cir. 2019). Also, in *Collins v. Berryhill*, the Seventh Circuit found that just 55,000 jobs was a significant number of jobs nationally. 743 F. App'x 21, 25-26 (7th Cir. 2018).

But the *Primm* court relied on *Liskowitz*, a case involving regional, rather than national, numbers. *Primm*, 789 F. App'x at 546; *see Liskowitz*, 559 F.3d at 743 (finding that 4,000 jobs in the Milwaukee area was a significant number, and commenting that "it appears to be well-established that 1,000 jobs is a significant number" (collecting cases)). The *Collins* court, indirectly, did as well. 743 F. App'x at 25-26 (relying on *Brown v. Colvin*, 845 F.3d 247, 255 (7th Cir. 2016), which in turn relied on *Liskowitz*). At least one judge in this judicial circuit has indicated that "reliance on *Liskowitz*'s regional threshold is . . . suspect (and, by extension, so is the reliance on *Primm*)" when considering a claimant's argument challenging the number of national jobs identified. *James A. v. Saul*, 471 F. Supp. 3d 856, 859-60 (N.D. Ind. July 10,

6

2020). Therefore, while *Primm* and *Collins* provide some guidance, they are not without their vulnerabilities.

"[D]istrict courts within the circuit—applying national numbers—have found as many as 120,350 jobs to not meet the burden, and as few as 17,700 jobs to be significant." *Angela L.*, 2021 WL 2843207, at *5 (citing *John C.*, 2021 WL 794780, at *5); *compare Sally S.*, 2019 WL 3335033, at *11 (120,350 jobs nationally is not a significant number), *with Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs nationally is a significant number). Thus, this circuit lacks clear guidance on what constitutes a "significant number" of jobs in the national economy. *See Sundsmo v. Saul*, No. 20-cv-100-wmc, 2020 WL 6817112, at *7 (W.D. Wis. Nov. 20, 2020) (concluding 67,327 jobs nationally was a significant number, observing that "this court has no ready guidance, other than to note that the ALJ's reliance of evidence of jobs in the national economy in the tens of thousands to find the claimant capable of full-time work appears consistent with decades of case law and the applicable regulations . . . ."); *see also Ellis v Kijakazi*, No. 20-CV-719, 2021 WL 3514701, at *5 (E.D. Wis. Aug. 9, 2021) (observing the "lack of clarity from the Seventh Circuit regarding . . . 'significant numbers'" when concluding that 14,500 nationally was not a significant number).

The undersigned Magistrate Judge faced a similar argument last year in *Knapp v. Saul*, No. 1:20-cv-00011-PPS-SLC, 2021 WL 536121, at *4-5 (N.D. Ind. Jan. 27, 2021), *R. & R. adopted by* 2021 WL 536483 (N.D. Ind. Feb. 12, 2021). There, I rejected the claimant's argument that 120,000 jobs nationally was not a significant number. *Id.* In doing so, I commented that "even when considering just the three jobs identified by the VE, the ALJ provided a sufficient number of jobs through his identification of 29,000 polishing machine operator jobs, 22,000 sorting machine operator jobs, and 16,500 wire insulator jobs." *Id.* at *4.

Thus, at least in the facts presented in *Knapp* and under the law at the time, I viewed that 67,500 jobs in the national economy would still be a significant number of jobs. *Id.*; *see also Sundsmo*, 2020 WL 6817112, at *7 (finding that 67,327 jobs nationally was a significant number of jobs); *Angela L.*, 2021 WL 2843207, at *6 (finding that 53,200 jobs nationally was a significant number of jobs).

Here, though, the number of representative jobs cited by the ALJ is 37,700. In the absence of Seventh Circuit controlling precedent on the matter, district courts in this circuit have turned to other circuits for guidance. *See, e.g.*, *Wildenberg v. Kijakazi*, No. 20-cv-297-bbc, 2021 WL 4077498, at *7 (W.D. Wis. Sept. 8, 2021); *Ducharme v. Saul*, No. 20-cv-356-bbc, 2021 WL 1711787, at *5 (W.D. Wis. Apr. 30, 2021), *appeal docketed*, No. 21-2204 (7th Cir. June 28, 2021); *Marko L. v. Saul*, No. 16 C 9723, 2021 WL 843427, at *7 (N.D. Ill. Mar. 5, 2021). As the Commissioner emphasizes, the Third, Sixth, and Eighth Circuits have all found that much fewer than 37,700 jobs is a significant number of jobs in the national economy. (ECF 21 at 16); *see Sanchez v. Comm'r of Soc. Sec.*, 705 F. App'x 95, 99 (3d Cir. 2017) (finding 18,000 jobs in the national economy significant); *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (finding 6,000 jobs in the national economy significant); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (finding 10,000 jobs in the national economy significant). Furthermore, several district courts in this circuit have found roughly 37,700 jobs to be significant. *See, e.g.*, *Ducharme*, 2021 WL 1711787, at *5 (finding 31,000 jobs in the national economy significant); *Wildenberg*, 2021 WL 4077498, at *7 (finding 33,000 jobs in the national economy significant); *Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at *17 (N.D. Ill. Dec. 19, 2019) (finding 40,000 jobs in the national economy significant); *Iversen v. Berryhill*, No. 16 CV 7337, 2017

8

WL 1848478, at *5 (N.D. Ill. May 8, 2017) (finding 30,000 jobs in the national economy significant).

Given the foregoing persuasive authority, and the lack of clarity in this circuit as to what constitutes a significant number of jobs, I conclude that 37,700 jobs in the national economy is a "significant number" of jobs for purposes of the ALJ's step-five determination in this case.

### D. The VE's Methodology

Levitz further contends that the VE's testimony as to the number of jobs Levitz could perform lacked a proper foundation, and thus that the ALJ's step 5 analysis is not supported by substantial evidence. (ECF 20 at 19-21). More specifically, Levitz faults the VE for failing to explain the formula or method the VE used to arrive at his job numbers, preventing any meaningful review. At the hearing, when questioned about how he reached his job numbers, the VE explained that he "utilize[d] the [Skill TRAN] estimates of jobs that exist by [DOT] number."[3] (AR 70). When pressed by Levitz's counsel on how SkillTRAN determines its numbers, the VE testified that: "They do research of companies and positions. No, I can't give you the formulation. In fact, nobody really knows . . . how they derive that." (AR 71). The VE also testified though, that vocational experts typically use SkillTRAN estimates, and that "it's the most accurate and best model to use." (AR 70-71). Levitz's counsel objected to the VE's testimony (*id.*), but the ALJ overruled the objection, writing that she was "satisfied that the jobs and numbers of jobs provided are reliable, as the [VE] has professional knowledge and experience in job placement." (AR 27).

---

[3] SkillTRAN is a software producer, which produces a variety of programs for vocational professionals, such as Job Browser Pro and Occubrowse. *See Dunn v. Kijakazi*, No. 20-C-1113, 2021 WL 5105169, at *12 (E.D. Wis. Sept. 24, 2021); *see also About,* SKILLTRAN, https://skilltran.com/index.php/home/about (last visited Jan. 11, 2022).

Once again, Levitz's arguments are unavailing. In general, an ALJ may carry her step-five burden through the use of vocational expert testimony, provided that such testimony is reliable. *See Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) ("[T]he substantial evidence standard requires the ALJ to ensure that the approximation [by the vocational expert] is the product of a reliable method."); *Liskowitz*, 559 F.3d at 743; *Ehrhart v. Sec'y of Health & Human Servs.,* 969 F.2d 534, 540 (7th Cir. 1992). "Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (citations omitted). Yet, "[e]stablishing the reliability of a job-number estimate does not require meeting an overly exacting standard." *Chavez*, 895 F.3d at 968. "A VE's estimate will be just that—an estimate." *Id.* "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations and internal quotation marks omitted).

The Seventh Circuit has recognized that the standards by which an expert's reliability are measured are generally less stringent at an administrative hearing than under the Federal Rules of Evidence. *Donahue*, 279 F.3d at 446. The Seventh Circuit's reasoning in *Liskowitz* is particularly relevant here:

> Perhaps ideally the VE would have been able to say a bit more, but this does not go without saying. The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundations of arithmetic in set theory. Is the statistician's use of arithmetic therefore unjustified? Clearly not. In administrative proceedings, no less than in ordinary life, "explanations come to an end somewhere."

559 F.3d at 743-44 (citation omitted).

Here, the VE's reliance on the Skill TRAN numbers, even if he was not able to articulate the specific formula or methods used to reach it, was sufficient. "Though the VE's description did not reveal the precise mechanics and statistical model involved, it nevertheless constitutes a 'reasoned and principled explanation,' at least by the low substantial evidence standard." *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020) (citing *Chavez*, 895 F.3d at 970); *see also Eminisor v. Comm'r of Soc. Sec.*, No. 3:19-CV-974-J-PDB, 2020 WL 5810237, at *6 (M.D. Fla. Sept. 30, 2020) ("The vocational expert's use of Job Browser Pro does not diminish the reliability of his testimony. Even if he did not know exactly how Job Browser Pro determines the percentages, Job Browser Pro is used by most vocational consultants he knows, indicating its reliability as a way to determine job numbers."); *Luna v. Berryhill*, No. 1:17CV354, 2018 WL 2316182, at *4 (N.D. Ind. May 21, 2018) ("The VE explained in his testimony at the hearing that, although he did not have SkillTRAN's methodology memorized, the methodology was available online. As there is no legal requirement that the ALJ or VE explain the methodology used by the SkillTRAN software, the court will not remand on this point."); *Wilhelm v. Berryhill*, No. 1:17cv22, 2017 WL 5248285, at *7 (N.D. Ind. Nov. 13, 2017) (noting "there is no legal requirement that the ALJ, or the vocational expert, explain the methodology used by SkillTRAN" (citation omitted)).

Furthermore, this is not a case in which the claimant made a demand for the VE's underlying sources and data. Rather, while Levitz's counsel questioned the VE about his methodology, he never actually asked the VE to produce his underlying data and sources. (*See* AR 70-71). And even if Levitz's counsel had made such a request, "vocational experts are not categorically required to provide their underlying data." *Krell v. Saul*, 931 F.3d 582, 587 (7th Cir. 2019) (citing *Biestek*, 139 S. Ct. at 1157). "The expert may decline to do so, and if he does,

11

this failure goes to the weight the ALJ may give the testimony." *Id.* "Considering the totality of his testimony, the expert can be deemed credible even if he provides no underlying data. The ALJ makes such determinations on a case-by-case basis."[4] *Id.* (citing *Biestek*, 139 S. Ct. at 1157). Nor did Levitz supplement the record after the hearing with a post-hearing brief or contrary numbers, sources, or methodology. *See Britton v. Astrue*, 521 F.3d 799, 804 (7th Cir. 2008) (suggesting various methods that a claimant may use to challenge a VE's testimony).

In summary, the ALJ properly relied on the VE's testimony regarding the availability of jobs in the national economy. While the VE was not able to fully explain the methodology utilized by SkillTRAN, he was not required to. Accordingly, remand is not necessary on these grounds either.

### E. The RFC

Finally, Levitz raises a variety of arguments suggesting that the ALJ erred in failing to consider all of his impairments in combination while determining his RFC. (ECF 20 at 21-24). First, Levitz asserts the ALJ "did not offer support as to how [he] could believably stand as much as 2 hours in a workday . . . ." (*Id.* at 22). Similarly, Levitz contends that the ALJ did not account for his obesity, and its interaction with his foot, back, and knee problems and his inability to sit for extended periods. (*Id.* at 22-23). Still more, Levitz contends the ALJ should have ordered a consultive examination to consider his allegations of depression. (*Id.* at 22). Somewhat confusingly, Levitz also suggests that the ALJ did take into account his obesity, but at the expense of other impairments like shortness of breath. (*Id.* at 23). Lastly, Levitz argues that the ALJ erred by failing to account for his supposed need to wear sandals and to get up and move

---

[4] At the same time, the Seventh Circuit advised that "[i]t is certainly best practice for vocational experts to provide underlying sources at hearings, and we encourage them to do so." *Id.* (citations omitted).

around to relieve knee and foot pain.  (*Id.* at 23-24).  For the reasons discussed *infra*, none of these arguments are persuasive.

In general, the RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week.  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  That is, the "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* at *1; *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  When determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

"[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) (citations omitted) (finding that the ALJ "satisfied the [RFC] discussion requirements by analyzing the objective medical evidence, [the claimant's] testimony (and credibility), and other evidence").  "The ALJ need not provide a written evaluation of every piece of evidence, but need only 'minimally articulate' [her] reasoning so as to connect the evidence to [her] conclusions." *Id.* at 657-58 (citing omitted); *see*

13

also *Catchings v. Astrue*, 769 F. Supp. 2d 1137, 1146 (N.D. Ill. 2011).  As explained earlier, Levitz bears the burden of proof at steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *Zurawski*, 245 F.3d at 886, and is therefore responsible for providing evidence that a greater restriction than one offered by the ALJ is necessary, *see Castile v. Astrue,* 617 F.3d 923, 927 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).

Here, a review of the ALJ's decision shows that she adequately explained her reasoning when determining the RFC.  As mentioned, the ALJ assigned Levitz an RFC for sedentary work as reduced by the following limitations:  occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme heat and cold, fumes, odors, dust, gases, and poor ventilation; and avoid unprotected heights.  (AR 19).  In assigning Levitz's RFC, the ALJ considered Levitz's weight gain, but further noted that "over time the claimant's weight has remained essentially consistent with morbid obesity. . . . [which] did not preclude substantial gainful work from 2013 through 2017 . . . ."  (AR 20; *see* AR 24).  The ALJ also noted that despite Levitz's claims regarding his inability to stand for prolonged periods, the record did not support either clinical findings for, or a diagnosis of, lower extremity neuropathy.  (AR 24).

Similarly, the ALJ noted that the record did not support bilateral knee deficits, or lower extremity or back defects.  (*Id.*).  Rather, the ALJ explained that despite Levitz's long-standing complaints regarding his knees, the record reflects "essentially normal lower extremity muscle strength, normal gait, normal sensation, no muscle atrophy/erythema/effusion/edema/crepitus, no sustained deficit in range of motion (ROM) or other lower extremity signs, and no sustained need for even conservative treatment since 2017."  (AR 20; *see, e.g.,* AR 421-22, 427-28, 467, 471, 477).  The ALJ also considered the opinions of the state agency physicians, who each opined that

14

Levitz retained the ability to perform light exertional work but never climb ladders, ropes, or scaffolds, and only occasional postural maneuvers. (AR 25 (citing AR 89-93, 114-117)). Nevertheless, "in an abundance of caution" the ALJ limited Levitz to sedentary work citing his "longstanding lower extremity bilateral knee complaints." (AR 24). The ALJ explained that sedentary work was "more accommodating of the overall evidence and of the allegations" despite Levitz's "minimal to unremarkable non-sustained mild back, pulmonary, and coronary findings, and non-compliance with diabetes along with obesity . . . ." (AR 24). None of the evidence in the record—or the lack thereof—cited to by Levitz undermines the ALJ's reasoning in this respect.

Levitz first points to his November 6, 2018, consultive examination, suggesting that the Commissioner's own consultative examiner opined that he could only sit for 10 minutes, stand for 30 minutes, and walk zero blocks. (ECF 20 at 22; *see* AR 414). Levitz, though, seemingly ignores that these limitations came solely from his own subjective statements. (AR 414). In fact, the ALJ ultimately found these statements to be unpersuasive, noting that the claims were made in the context of determining disability and that there were no *medical opinions* from any source opining the need for such limitations. (AR 24). This is not an error. *See Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Ziegler v. Astrue*, 576 F. Supp. 2d 982, 998 (W.D. Wis. 2008) ("It is well settled that an administrative law judge may disregard a medical opinion premised on the claimant's self-reported symptoms if the administrative law judge has reason to doubt the claimant's credibility." (collecting cases)), *aff'd,* 336 F. App'x 563 (7th Cir. 2009); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective

observations and not amount merely to a recitation of a claimant's subjective complaints."). Still more, as mentioned, the ALJ properly relied upon the opinions of the state agency physicians, who reviewed the record in November 2018 and February 2019, respectively, but assigned a less restrictive RFC. (*See* AR 24, 89-93, 114-117); *see also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Levitz also suggests that the medical record was incomplete, contending that "[w]ith allegations of depression on the record, a psych [consultive examination] was likely due . . . ." (ECF 20 at 22). But the Court "gives deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011) (citation omitted). "Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence that further development of the record is required." *Id.* "In the absence of a request by counsel, the ALJ must order an examination only when the need for one is clearly established in the record." *Elbert v. Barnhart*, 335 F. Supp. 2d 892, 906 (E.D. Wis. 2004).

Here, Levitz has failed to show that further development of the record was necessary. Levitz did not allege a mental impairment in his application for DIB and SSI (ECF 256), and the ALJ considered that Levitz regularly denied, and the record did not regularly reflect, mental health defects. (AR 24; *see, e.g.,* 442, 445-46). While Levitz did report depression on December 18, 2019, to Michael Conway, M.D. (AR 442), the ALJ addressed the report, noted the lack of support in the record, and concluded that it was "not reasonably consistent with nor supportive of sustained complaints enduring as severe for 12 months despite treatment" (AR 24). Given the limited reports of depression and its apparent effects on Levitz's ability to function in a work

environment, the Court cannot say the need for an additional consultive examination was "clearly established," and Levitz points to no further evidence that additional development of the record is needed.

Levitz, in passing, also makes a brief rhetorical argument suggesting that the ALJ all but admitted that she did not consider all of Levitz's impairments in combination. In particular, Levitz suggests that the "ALJ admits that the sedentary exertion level is sufficiently accounted for the lower extremity problems in the context of obesity alone." (ECF 20 at 23 (citing AR 20 ("The undersigned acknowledges the claimant's lower extremity complaints occurring in the context of obesity, and in so doing, limits the claimant to sedentary exertion."))). As such, Levitz contends that "further things such as the back problems, shortness of breath, *inter alia*, cannot logically also be the basis for the already reached limitation based on simply lower-extremity problems and obesity." (ECF 20 at 23).

This argument, however, is also a non-starter. The Court "read[s] the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (citations omitted)). Here, the ALJ did not cabin her discussion of Levitz's impairments to just his obesity, but discussed the medical record as a whole. In fact, the ALJ specifically referenced Levitz's allegations of shortness of breath (AR 21 (citing AR 288)), but contrasted with Levitz's daily activities, normal clinical findings, and consistent denial of pulmonary symptoms (AR 22 (citing AR 547-49, 552, 557, 563, 566-67)).

Again, the Court gives an ALJ's decision a "commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). There is no requirement for "tidy packaging." *Buckhanon*, 68 F. App'x at 678-79. While one can interpret a single sentence in the ALJ's decision to suggest that the ALJ only considered Levitz's

17

impairments in the context of his obesity, the Court will not ignore the rest of the decision explicitly discussing other ailments such as Levitz's shortage of breath.  In any event, Levitz yet again fails to explain what other limitations his apparent shortage of breath would require.  Accordingly, this argument fails too.

Levitz next argues that his back and foot problems, in combination with his obesity, "would further interact to limit sitting and standing even more than mere sedentary [sic]" and suggests that his "knees alone . . . reasonably reduces [his] ability [to stand] below the sedentary level. . . considering that . . . the knees make exercise difficult."  (ECF 20 at 22-23).  Further, Levitz contends that his knee problems are not accounted for in the RFC, as the VE testified at the hearing that unskilled workers would "not be able just to walk around the [work] facility" to relieve discomfort, but "would have to stay at their work stations."  (AR 69; *see* AR at 23-24).  He also faults the ALJ for not including his apparent need to wear sandals in the RFC.  (ECF 20 at 23).  Finally, Levitz contends that the ALJ erred in relying on his ability to sit on the bleachers at a football game to support a finding that he could handle "*unlimited* sitting in the workplace" and by failing to require that he sit in chairs with backs.  (*Id.*).

As an initial point, it is not clear that the ALJ took Levitz's attendance at a football game as evidence that he could endure unlimited sitting.  Rather the ALJ seems to simply contrast Levitz's attendance at the football game with his testimony that he did not attend his children's sports and school events.  (AR 21-22).  While the ALJ did reference the football game again in her decision, she primarily focused on Levitz's emergency room visit *after* the game and the lack of clinical findings suggesting the need for additional limitations.  (AR 25).

In fact, Levitz's argument—that the ALJ did not explain how he could be expected to sit for extended periods in a work environment—misses the point.  To reiterate, "[t]he claimant

18

bears the burden of submitting medical evidence establishing [his] impairments and [his] [RFC]." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir 2011) (citations omitted).  Again, Levitz fails to identify any opinion or evidence in the medical record necessitating greater limitations than those identified by the ALJ in the RFC.  As already discussed, the ALJ combed through the record and found that the Levitz could perform sedentary work "despite minimal to unremarkable non-sustained mild back, pulmonary, and coronary findings, and non-compliance with diabetes along with obesity . . . ." (AR 24).  Similarly, the ALJ considered evidence regarding Levitz's inability to exercise due to his knee pain but determined that it was "unaccompanied by significant sustained clinical deficits on exams or the need of a specific referral or specific need for treatment." (*Id.*).  While the ALJ does not appear to have specifically mentioned Levitz's testimony regarding his need to wear sandals, again the ALJ need not mention every piece of evidence.  *See Knox*, 327 F. App'x at 657-58.  In any event, Levitz does not explain, nor is there any evidence to suggest, that a need to wear sandals precludes him from sedentary work within the bounds of the RFC.  In fact, the only reference to Levitz's apparent need to wear sandals came during Levitz's testimony at the hearing, where he testified that he "wear[s] slides, sandals . . . . because [his] feet hurt when [he] put[s] them down in shoes." (AR 51).  As such, this is not an instance where the ALJ ignored entire lines of evidence contrary to her ultimate opinion.  *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).  Rather, the ALJ did precisely what she is permitted to do—weigh the evidence, resolve conflicts, and decide questions of credibility.  *See Clifford*, 227 F.3d at 869.

   In summary, the ALJ considered not only the medical evidence but also the lack thereof—specifically, the lack of any medical source opinion stating that Levitz was unable to perform sedentary work whether it be due to his shortness of breath, need to wear sandals, or

allegations of depression.  *See Hall v. Barnhart*, No. 1:04-cv-1847-DFH-TAB, 2006 WL 3206096, at *4 (S.D. Ind. June 15, 2006) (explaining that the lack of objective medical evidence is a factor to be considered by the ALJ when assessing a claimant's symptom testimony).  Ultimately, "the RFC determination is one firmly within the ALJ's discretion to determine, so long as [she] sufficiently articulates [her] reasoning and the record adequately supports [her] conclusion."  *Terry v. Astrue*, No. 3:09-CV-503 JD, 2011 WL 855346, at *17 (N.D. Ind. Mar. 7, 2011) (collecting cases).  Here, the ALJ did not fail to develop the record or ignore evidence contrary to her decision.  Rather, as required, she built an accurate and logical bridge between the evidence in the record and her RFC formulation.  Consequently, Levitz's argument challenging the RFC is unavailing, and the Commissioner's final decision will be affirmed.

## IV.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Levitz.

SO ORDERED.

Entered this 12th day of January 2022.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge
